UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X   Case No.

MARIA ERIN O'SHEA,

**COMPLAINT**

Plaintiff,

-against-

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

DAVID ROSENBERG, M.D., PLLC,
d/b/a MANHATTAN AESTHETICS, d/b/a
MANHATTAN FACIAL SURGICAL SUITES, PLLC,
DAVID ROSENBERG, M.D., *Individually,*
BENJAMIN PAUL, M.D., *Individually,*
MICHAEL SHIFRIN, *Individually*, and
SARA LOSOVIZ, R.N., *Individually,*

Defendants.

-------------------------------------------------------------------------X

Plaintiff, MARIA ERIN O'SHEA, by her attorneys, PHILLIPS & ASSOCIATES,

Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and belief, as

follows:

## NATURE OF THE CASE

1.     Plaintiff complains pursuant to <u>Americans with Disabilities Act of 1990</u>, 42 U.S.C. §

12101, *et seq*. ("ADA"), the <u>New York State Human Rights Law</u>, New York State

Executive Law § 296 *et seq.,* ("NYSHRL"); and <u>New York City Human Rights Law</u>,

New York City Administrative Code §8-502(a), *et. seq.* ("NYCHRL"), and seeks

damages to redress the injuries Plaintiff has suffered as a result of being discriminated

against on the basis of her disability and in retaliation for requesting a reasonable

accommodation under the ADA resulting in a hostile work environment and in Plaintiff's

employment termination by the Defendants.

## JURISDICTION AND VENUE

2.   Jurisdiction of this Court is proper under 42 U.S.C. § 1981, 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§1331 and 1343.

3.   The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. §1367.

4.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b), as the acts complained of occurred therein.

## PARTIES

5.   That at all times relevant hereto, Plaintiff MARIA ERIN O'SHEA ("Plaintiff") was a resident of the State of New York, Kings County.

6.   That at all times relevant hereto, Defendant DAVID ROSENBERG, M.D., PLLC, d/b/a MANHATTAN AESTHETICS, d/b/a MANHATTAN FACIAL SURGICAL SUITES, PLLC, ("MANHATTAN AESTHETICS") was a DOMESTIC PROFESSIONAL SERVICE LIMITED LIABILITY COMPANY doing business in the State of New York, and operating a place of business located at 225 East 64th Street, in the County, City and State of New York.

7.   That at all times relevant hereto, Plaintiff was employed by DEFENDANT MANHATTAN AESTHETICS as a registered nurse.

8.   At all times relevant hereto, Defendant DAVID ROSENBERG, M.D., ("ROSENBERG") was the owner and medical director of Defendant MANHATTAN AESTHETICS. DEFENDANT ROSENBERG was Plaintiff's supervisor and boss, and had managerial authority over Plaintiff and the authority to fire her. DEFENDANT ROSENBERG hired Plaintiff to work for MANHATTAN AESTHETICS.  DEFENDANT ROSENBERG is

sued herein in his individual capacity.

9. At all times relevant hereto, Defendant BENJAMIN PAUL, M.D., ("PAUL") was a surgeon and doctor at Defendant MANHATTAN AESTHETICS. DEFENDANT PAUL was Plaintiff's supervisor and boss, and had managerial authority of Plaintiff and the authority to fire her. DEFENDANT PAUL hired Plaintiff to work for MANHATTAN AESTHETICS.  DEFENDANT PAUL is sued herein in his individual capacity.

10. At all times relevant hereto, Defendant MICHAEL SHIFRIN ("SHIFRIN") was an employee and the Director of Operations at Defendant MANHATTAN AESTHETICS. DEFENDANT SHIFRIN was Plaintiff's supervisor and boss, and had managerial authority of Plaintiff and the authority to fire her. DEFENDANT SHIFRIN hired Plaintiff to work for MANHATTAN AESTHETICS.  DEFENDANT SHIFRIN is sued herein in his individual capacity.

11. At all times relevant hereto, Defendant SARA LOSOVIZ, R.N., ("LOSOVIZ") was an employee and the "charge nurse," or the registered nurse in charge, at Defendant MANHATTAN AESTHETICS. DEFENDANT LOSOVIZ was Plaintiff's supervisor and boss, and had managerial authority of Plaintiff and the authority to fire her. DEFENDANT LOSOVIZ is sued herein in her individual capacity.

12. That at all times relevant hereto, Defendants MANHATTAN AESTHETICS, ROSENBERG, PAUL, SHIFRIN, and LOSOVIZ, are collectively referred to herein as "DEFENDANTS."

**MATERIAL FACTS**

13.     On April 30, 2018, Plaintiff was interviewed at DEFENDANT MANHATTAN

AESTHETICS by DEFENDANTS ROENBERG, PAUL, and SHIFRIN.

14.     Plaintiff was hired to work at   a pay rate of $85,000.00 per year, plus bi-yearly

employment bonuses.

15.     DEFENDANTS ROSENBERG, PAUL and SHIFRIN hired Plaintiff on the spot, asking

her for the soonest date she could start working for the DEFENDANTS.

16.     PLAINTIFF informed DEFENDANT ROSENBERG that she was working as a school

nurse at a public high school in Downtown Brooklyn.

17.     Plaintiff also informed DEFENDANT ROSENBERG that she had just been hired by the

New York City Department of Health and Mental Hygiene to start working full-time as a

New York City employee in September of 2018, and that she also had a job lined up with

Poly Prep Country Day Camp for the summer of 2018 as a summer camp nurse.

18.     However, Plaintiff accepted the job with the DEFENDANTS, thereby foregoing her other

employment offers.

19.     The DEFENDANTS initially told Plaintiff that she would be the "up front" nurse,

responsible for answering calls, e-scribing prescriptions, seeing follow-up patients and

post-operative patients, organizing the flow of the intake and procedure rooms as well as

the consult and exam rooms.

20.     Specifically, some of Plaintiff's job duties included patient pre-operative education,

discharge planning, assisting doctors with sterile procedures such as platelet rich plasma

procedures, injections and hair transplants.

21.    The DEFENDANTS, including DEFENDANT LOSOVIZ, told Plaintiff that eventually her job responsibilities would increase and she would be doing everything the other nurses in the office were doing.

22.    Plaintiff's employment training was largely conducted by DEFENDANT LOSOVIZ, the charge nurse at MANHATTAN AESTHETICS.

23.    During Plaintiff's training, Plaintiff was not always trained as the "up-front" nurse. Rather, during her training, Plaintiff was taught how to circulate in the operating room and recover patients post-operatively.

24.    On any given day while working for the DEFENDANTS, Plaintiff was assigned wherever there was a need for her.

25.    By the end of the fourth week of Plaintiff's training and employment with the DEFENDANTS, Plaintiff was essentially working on her own without DEFENDANT LOSOVIZ.

26.    In or around the last week of May 2018, Plaintiff confided in DEFENDANT LOSOVIZ and another co-worker, Juliet Spinelli, that Plaintiff was in recovery for opioid addiction.

27.    Plaintiff further informed DEFENDANT LOSOVIZ and Juliet Spinelli that she was enrolled in the Professional Assistance Program (PAP), which assists professionals who have substance abuse problems, but who have not harmed patients or clients.

28.    Plaintiff further informed DEFENDANT LOSOVIZ and Juliet Spinelli that she has been enrolled in PAP since February 2017, Plaintiff's nursing license is in good standing, and she's never faced any misconduct charges.

29.    Plaintiff further informed DEFENDANT LOSOVIZ and Juliet Spinelli that, as part of the PAP program and her sobriety, Plaintiff is required to find a "worksite monitor".  Plaintiff

5

also stated that, as part of the PAP program and her sobriety, Plaintiff was required to and did complete random drug tests, and worked with support groups and mental health professionals.

30.  A worksite monitor is someone (usually a nurse or doctor, superior in rank at the place of employment of the PAP participant)  to whom a PAP participant would disclose being in recovery. The worksite monitor is also responsible for answering four to five questions about the PAP participant every three to four months over email.  The questions are simple, one answer questions.

31.  Plaintiff further informed DEFENDANT LOSOVIZ and Juliet Spinelli that Plaintiff was sober and that as of May 2018, Plaintiff had been sober over 13 months.

32.  Plaintiff explicitly asked DEFENDANYT LOSOVIZ and Juliet Spinelli to keep confidential what Plaintiff had told them.

33.  The next day after this conversation, Plaintiff asked DEFENDANT LOSOVIZ if she would be Plaintiff's work-site monitor.

34.  DEFENDANT LOSOVIZ refused this request from Plaintiff and DEFENDANT LOSOVIZ made no attempt to engage in any interactive process to find a reasonable accommodation for Plaintiff's disability.

35.  In response to DEFENDANT LOSOVIZ's refusal, Plaintiff informed DEFENDANT LOSOVIZ that the process would be strictly confidential and that DEFENDANT LOSOVIZ could speak to Plaintiff's case manager with the New York State Board of Nursing in Albany, New York.

36.  Nonetheless, DEFENDANT LOSOVIZ refused to be Plaintiff's work site monitor and the DEFENDANTS made no attempt to engage in any interactive process with Plaintiff

regarding her disability.

37. Following Plaintiff's May 2018 conversation with DEFENDANT LOSOVIZ and Juliet Spinelli, two other coworkers told Plaintiff that she should be careful about who she confides in at work.

38. Specifically, a surgical technician named Hicham Doe approached Plaintiff and told her, in sum and substance, that "there is a lot of gossip in the office" and that anything Plaintiff reveals about herself would be "used against" Plaintiff, and "seen as a weakness."

39. On another occasion after Plaintiff's May 2018 conversation with DEFENDANT LOSOVIZ and Juliet Spinelli, a coworker named Ally Doe approached Plaintiff and cryptically warned Plaintiff, in sum and substance, "not [to] tell too much about [Plaintiff's] personal life" because people in the office can use the information to "judge" Plaintiff.

40. On June 1, 2018, DEFENDANT SHIFRIN asked Plaintiff to have a drink with him in the office. Plaintiff declined this request.

41. The week of June 4, 2018, DEFENDANT SHIFRIN again asked Plaintiff to have a drink with him in the office. Plaintiff declined and said that she would "toast with water." DEFENDANT SHIFRIN responded to this by saying "that is bad luck." Nonetheless, Plaintiff discretely declined DEFENDANT SHIFRIN's request for Plaintiff to have a drink.

42. Later during the week of June 4, 2018, DEFENDANT LOSOVIZ told Plaintiff that people in the office were asking why Plaintiff does not drink. DEFENDANT LOSOVIZ told Plaintiff that DEFENDANT LOSOVIZ had told these people asking that "[Plaintiff]

doesn't drink."

43.    After this conversation with DEFENDANT LOSOVIZ, Plaintiff figured that it was common knowledge in the office that Plaintiff was sober, so Plaintiff decided to be open about her sobriety.

44.    Despite this pressure from the DEFENDANTS for Plaintiff to drink in the office, Plaintiff continued to do her job well and had a large amount of responsibilities.

45.    On or about July 5, 2018, Plaintiff spoke to DEFENDANT PAUL and confided in him that she was sober.   DEFENDANT PAUL seemed sympathetic and genuine, offering Plaintiff advice by suggesting that Plaintiff tell DEFENDANT ROSENBERG about her sobriety.

46.    DEFENDANT PAUL reassured Plaintiff by telling her that by telling DEFENDANT ROSENBERG about her sobriety, DEFENDANT ROSENBERG would be able to get to know Plaintiff better.

47.    Further, DEFENDANT PAUL told Plaintiff that everyone who worked in the office was "like a small family" and "it's important for everyone to get to know each other."

48.    During the second week of July 2018, after DEFENDANT PAUL suggested to Plaintiff that she tell DEFENDANT ROSENBERG about her sobriety, Plaintiff spoke to DEFENDANT ROSENBERG.

49.    During this conversation, Plaintiff disclosed to Dr. Rosenberg that she was in recovery for opioid addiction.   Plaintiff also informed DEFENDANT ROSENBERG that she was voluntarily enrolled in PAP, which assists professionals who have substance abuse problems, but who have not harmed patients or clients.

50.    Plaintiff further informed DEFENDANT ROSENBERG that she has been enrolled in

PAP since February 2017, Plaintiff's nursing license is in good standing, and she's never faced any misconduct charges.

51.    Plaintiff also stated that, as part of the PAP program, Plaintiff was required to and did complete random drug tests, and worked with support groups and mental health professionals.

52.    Plaintiff further informed DEFENDANT ROSENBERG that Plaintiff was sober and that as of July 2018, Plaintiff had been sober over 15 months.

53.    DEFENDANT ROSENBERG responded to Plaintiff's disclosure by coldly telling her "I don't know why you feel the need to share this with me."

54.    DEFENDANT ROSENBERG seemed annoyed by Plaintiff's disclosure to him.

55.    DEFENDANT ROSENBERG also told Plaintiff, "I am not concerned about you."

56.    DEFENDANT ROSENBERG then began to coldly minimize and dismiss what Plaintiff had disclosed to him by stating, in sum and substance, "It is not like you have an eating disorder and need to think about what you are going to eat every day. If someone has a problem with alcohol, the should take it out of their house.  If someone has a problem with pills, then they should get rid of the Percocet in their medicine cabinet."

57.    The week prior to Plaintiff's conversation with DEFENDANT ROSENBERG, in or about the first week of July 2018, DEFENDANTS LOSOVIZ and PAUL reprimanded Plaintiff for asking for help with a patient by telling her that she was acting "alarmist."

58.    Plaintiff was not behaving in an alarmist manner and, it is DEFENDANT ROSENBERG who would often ask for help in the office by yelling "NURSEY!" at Plaintiff.

59.    During this conversation, DEFENDANT PAUL told Plaintiff, in sum and substance "You need to walk into Hermes on Madison Avenue and see how the sales staff speaks to

customers. Be more like that."

60.   Plaintiff was taken aback and astonished that DEFENDANTS PAUL and LOSOVIZ were reprimanding her when she had not done anything wrong, and it appeared to Plaintiff that by doing so, the DEFENDANTS were attempting to lay a pretextual ground for Plaintiff's termination.

61.   Plaintiff nonetheless thanked DEFENDANTS PAUL and LOSOVIZ for their feedback and excused herself, feeling frustrated by the conversation.

62.   Plaintiff then walked into the kitchen, where no coworkers were present and where no patients could see into, and briefly, discretely cried. Though Plaintiff attempted to cry without being seen, two co-workers named Ally Doe and Ivelisee Doe walked in and saw Plaintiff.

63.   Plaintiff asked them not to tell anyone that they had seen her crying.

64.   However, the following week, after Plaintiff had disclosed her sobriety to DEFENDANT ROSENBERG, he responded to Plaintiff's disclosure in part by telling Plaintiff "I heard that you cried when [DEFENDANT] Doctor Paul gave you feedback. Crying when someone gives you feedback is manipulative, shows fragility and weakness, and makes people not want to you help you for fear that every time they talk you will cry."

65.   Plaintiff was taken aback and surprised that DEFENDANTS ROSENBERG and PAUL knew that she had cried, because she did not want them to know about it and had attempted to cry in private.

66.   Nonetheless, Plaintiff responded to DEFENDANT ROSENBERG's comment by telling him that Plaintiff welcomes constructive criticism and that she did not cry because of the constructive criticism.

67.   DEFENDANT ROSENBERG cut Plaintiff off and said "It doesn't matter at this point. You won't last if that is your response."

68.   Wanting to fix the situation and worried for her job, Plaintiff thanked DEFENDANT ROSENBERG for the advice and shook his hand.

69.   The next day, DEFENDANT ROSENBERG told Plaintiff "I have a lot of faith in you and you are doing a good job."

70.   A few days later, on or about the end of the second week in July, DEFENDANTS SHIFRIN and LOSOVIZ met with Plaintiff to discuss her performance.

71.   DEFENDANTS SHIFRIN and LOSIVIZ told Plaintiff, in sum and substance, that she was "doing a really good job" and "catching on quickly."

72.   DEFENDANTS SHIFRIN and LOSOVIZ also told Plaintiff that is was inappropriate for her to cry as she had previously done in the kitchen.

73.   Plaintiff responded by telling that she had not cried because she was given feedback, but rather because of DEFENDANT PAUL's comment advising Plaintiff to improve by going into clothing stores on Madison Avenue to observe the way sales associates behaved.

74.   DEFENDANTS SHIFRIN and LOSOVIZ responded by thanking Plaintiff for her honesty, but DEFENDANT SHIFRIN then told Plaintiff that he wanted her to go shopping along Madison Avenue and go in and out of the retail stores to see how people of the "upper echelon" behave.

75.   Nonetheless, DEFENDANTS SHIFRIN and LOSOVIZ told Plaintiff that her job was not in jeopardy and that they were committed to Plaintiff and wanted to make Plaintiff feel comfortable.

76.     On August 2, 2018, DEFENDANTS SHIFRIN and LOSOVIZ brought Plaintiff into the kitchen area of MANHATTAN AESTHETICS and told her that they had bad news. DEFENDANTS SHIFRIN and LOSOVIZ then terminated Plaintiff' employment and told her that she was "not a good fit," though they also told her that they were exercising their right to fire her "without providing a reason."

77.     DEFENDANTS SHIFRIN and LOSOVIZ told Plaintiff that they had passed Plaintiff's resume on to a recruiter and another plastic surgeon in the area and that DEFENDANTS would give Plaintiff a good letter of reference if she agreed to sign a contract releasing the DEFENDANTS from all claims.

78.     Plaintiff has not signed this agreement.

79.     Plaintiff was then terminated immediately and was asked to leave the premises, which she did.

80.     At no point did the DEFENDANTS offer Plaintiff any reasonable accommodation regarding her disability, despite the fact that Plaintiff had asked DEFENDANT LOSOVIZ to be her work-site monitor. The Defendants had not offered any resolutions, nor did they offer any support or assistance to Plaintiff.

81.     The accommodations requested by the Plaintiff would pose no undue burden to the Defendants.

82.     Plaintiff was qualified to perform her job and Plaintiff had no disciplinary issues at work.

83.     Defendants were aware that Plaintiff was sober and was fighting her addiction by way of her enrollment in PAP.

84.     As part of this program, in order to ensure her sobriety, Plaintiff required a worksite monitor, which the DEFENDANTS refused to provide.

85.  Plaintiff's addiction and related impairments required her to have a worksite monitor at that time.

86.  **Based upon the aforementioned actions, it is clear that on August 2, 2018, DEFENDANTS terminated Plaintiff's employment due her disability and due to the fact that the DEFENDANTS perceived Plaintiff to have a disability which impacted her ability to do her job.**

87.  **Based on the proximity between Plaintiff's disclosure of her addiction to the DEFENDANTS to the time DEFENDANTS began to reprimand Plaintiff and terminate her, it is clear that the DEFENDANTS regarded Plaintiff as having an impairment and terminated her for this reason.**

88.  Plaintiff feels offended, disturbed, and humiliated by the blatantly unlawful, discriminatory termination.

89.  The above are just some of the acts of harassment and discrimination that Plaintiff experienced on a regular and continual basis while employed by Defendants.

90.  Defendants treated Plaintiff differently solely due to her disability or perceived disability.

91.  **But for the fact of Plaintiff's disability and the fact that she requested a reasonable accommodation Defendants would not have treated her differently and would not have terminated her employment.**

92.  Defendants created an unlawfully hostile and intimidating work environment, which unreasonably interfered with Plaintiff's employment.

93.  Plaintiff was subjected to a discriminatory, hostile, and abusive work environment that no reasonable person in Plaintiff's shoes should or could be expected to endure.

94.  Defendants' actions and conduct were intentional and intended to harm Plaintiff.

95.     Defendants treated Plaintiff differently solely because of her disability and/or because of her perceived disability.

96.     Defendants' actions and conduct were intentional and intended to harm Plaintiff.

97.     Plaintiff has been unlawfully discriminated against, humiliated, degraded and belittled, and as a result, suffers loss of rights, emotional distress, loss of income, earnings and physical injury.

98.     As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

99.     As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, Plaintiff has suffered severe emotional distress.

100.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

101.    As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

102.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.  As such, Plaintiff demands Punitive Damages as against all Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION
## <u>UNDER THE AMERICANS WITH DISABILITIES ACT</u>
## <u>(Not Against Individual Defendants)</u>

103.  Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

104.  Plaintiff claims Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

105.  Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

106.  Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff by refusing to grant Plaintiff reasonable accommodations which she requested and ultimately terminating her employment.

107.  As such, Plaintiff has been damaged as set forth herein.

**AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK STATE EXECUTIVE LAW**
**(Against All Defendants)**

108.    Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

109.    The New York State Executive Law § 296(1)(a) provides that, "It shall be an unlawful discriminatory practice: For an employer … because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

110.    Defendants engaged in an unlawful discriminatory practice in violation of the New York State Executive Law § 296(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her disability or perceived disability.

**AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK STATE EXECUTIVE LAW**
**(Against Individual Defendants Only)**

111.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

112.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any acts forbidden under this article, or attempt to do so."

113.    Defendants engaged in an unlawful discriminatory practice in violation of New York

State Executive Law § 296 by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct complained of herein.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

114.   Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

115.   The New York City Administrative Code §8-107(1) provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

116.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her disability or perceived disability.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

117.   Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

118.   The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

17

119.   Individual Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory conduct.

### AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

120.   Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

121.   The New York City Administrative Code §8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

    a.   An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b.   An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

        1.   the employee or agent exercised managerial or supervisory responsibility; or

        2.   the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

        3.   the employer should have known of the employee's or agent's

discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c.   An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

122.   Defendants violated the section cited herein as set forth.

## **JURY DEMAND**

123.   Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.,* the New York State Human Rights Law § 296 *et. seq.*, and the New York City Administrative Code §8-107 *et. seq.*, in that Defendants discriminated against Plaintiff on the basis of her disability and failed to grant her a reasonable accommodation;

B.   Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.   Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.   Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of

the action; and

F.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just

and proper to remedy Defendants' unlawful employment practices.

Dated:  New York, New York
          January 11, 2019

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

/s/

By:    _____
       Jessica Massimi, Esq.
       *Attorneys for Plaintiff*
       45 Broadway, Suite 620
       New York, New York 10006
       (212) 248-7431
       jmassimi@tpglaws.com